**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SHADONIE PAYLOR,

      Plaintiff,

        v.                                    Civil Action No. 22-3359 (JEB)

DISTRICT OF COLUMBIA, *et al.*,

      Defendants.

**MEMORANDUM OPINION**

One afternoon in August 2019, Plaintiff Shadonie Paylor was waiting to pick up her children from school in her Southeast Washington neighborhood. She observed several officers of the Metropolitan Police Department conduct an arrest that soon snowballed into a larger confrontation. She filmed the incident and, after twice crossing the officers' makeshift police line, she became their next target for arrest. Paylor fled and the officers gave chase, ultimately tackling her to the ground and bruising her in the course of subduing her. She then filed this excessive-force suit against several officers and the District of Columbia under 42 U.S.C. § 1983 and District of Columbia common law. At this stage, only her § 1983 excessive-force claims against Officers Caleb Demeritt, Corbin Seward, and Joshua Jarvie remain.

These Defendants now seek summary judgment, asserting that qualified immunity shields them both because they acted reasonably when arresting Plaintiff and because they did not offend any clearly established prohibitions on the use of force. Although the body-worn-camera footage is lacking in some key respects, it vindicates their position with a little help from other evidence in the record, including Plaintiff's own version of events. At the end of the day, while

1

the officers' conduct as a whole may have left much to be desired, the Court nonetheless enters judgment in their favor on immunity grounds.

I.    **Background**

Body-worn cameras are a boon to courts examining alleged police misconduct because the evidence is frequently uncontroverted.  While the BWC footage here settles many of the disputes surrounding these events, several pivotal facts were lost to gaps in video coverage and jostled cameras.  To bring the blurrier moments into focus, the Court views the facts, as it must, in the light most favorable to Plaintiff.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

In the middle of an August 2019 day, MPD Officers Demeritt and Seward arrived on Bruce Place, S.E., in pursuit of an individual they had attempted to pull over in a traffic stop. See ECF Nos. 18 (Pl. Statement of Disputed Material Facts), ¶ 1; 17-1 (MPD File) at 7–8.  While arresting another suspect as part of that stop, the officers observed an unrelated individual, Dalonta Holliway, engaging in public consumption of cannabis a short distance away.  See Pl. SDMF, ¶ 1; MPD File at 8.  Not keen on letting the minor offense go, the officers determined to arrest Holliway as well.  See Pl. SDMF, ¶ 2.  This decision unfortunately kicked off a chain reaction.

Disgruntled observers, seemingly not sure what Holliway was being carted off for, began voicing their outrage.  One of these observers was Dominique Burley, who stood close by as the two officers placed Holliway in handcuffs.  See Seward BWC at 3:30–:42.  So close, in fact, that Seward felt the need to place a hand on his shoulder and push him away, telling him to "back up."  Id. at 3:45–:47.  At this point, Officer Jarvie arrived.  He was just in time to slow Burley's attempt to follow Holliway as he was being removed from the growing crowd by Demeritt.  See

2

Jarvie BWC at 2:55–3:03.  Burley was not easily dissuaded: he swatted Jarvie away and continued to follow Holliway and Demeritt.  Id. at 2:59–3:03.  Seward then jumped in to assist, shoving Burley backwards and placing his body in Burley's way, only to have his hands swatted at as well.  Id. 3:03–:07; Seward BWC at 3:55–4:03.  But Jarvie was not the only one with backup coming to his aid; Paylor joined the fray by inserting herself between Burley and the officers, filming the interaction, pushing Seward back, and yelling, "Don't touch him."  Jarvie BWC at 3:06–:12.

Things devolved from there.  Jarvie moved ahead with arresting Burley even as several bystanders attempted to prevent him from doing so.  Id. at 3:13–:37.  In the melee, Paylor can be seen having some minor physical contact with Jarvie.  Id. at 3:31–:33; Seward BWC at 4:19–:22.  According to Jarvie and Seward, Paylor "pull[ed] Officer Jarvie's arm to prevent him from handcuffing Burley and also tried to pull Burley away from Officer Jarvie's grip," but this does not clearly appear on video and Paylor denies it.  See ECF No. 17-4 (Decl. of Corbin Seward), ¶ 8; ECF No. 17-2 (Decl. of Joshua Jarvie), ¶ 8; ECF No. 20-1 (Decl. of Shadonie Paylor), ¶ 8. Interference notwithstanding, Jarvie eventually prevailed in arresting Burley.  See Jarvie BWC at 3:30–4:05.  As he led Burley out of the crowd and toward the area where the other two arrestees were being held, the throng of spectators followed.  See Pl. SDMF, ¶ 4.  Seward and Demeritt herded them away with commands to "back up," and — in Seward's case — by pointing a can of mace at them.  See Seward BWC at 4:25–5:00; Demeritt BWC at 4:43–:56; Pl. SDMF, ¶¶ 5–6.

With the crowd shepherded to a safe distance from the three arrestees, but still agitated, Demeritt and Seward threatened them with arrest and force to keep them from boiling over. Seward repeatedly informed the onlookers that they must back up or they would be sprayed with mace.  See Seward BWC at 5:22–:27.  Demeritt then told the group of ten or so gathered

individuals that he was establishing a "police line."  He gestured at its general location and explained that anybody who crossed the line would be arrested.  See Demeritt BWC at 5:28–:35. Seward backed him, repeating the warning that "if you cross this line, you will be placed under arrest."  Seward BWC at 5:32–:35.

Paylor and others did not exactly toe that line.  Plaintiff, who was still filming the events on her phone, first tested the boundary by slowly walking up to, and possibly past, the line Demeritt had just established.  See Demeritt BWC at 5:50–6:03.  When he advised her once again to back up, she initially complied.  Id.  Such obedience was short lived, however, as she walked around and past him mere seconds later, clearly disobeying his previous orders.  Id. at 6:05–:12.  Demeritt seemingly placed a hand on her arm to stop her movement, prompting her to backpedal once more.  Id.

As any observer of altercations knows, retreat does not always signal resignation; this scuffle was no different.  After a short rest, Paylor advanced again, flanked by several others, eliciting another round of commands to back up, which went unheeded.  Id. at 6:32–:38.  Fed up, Demeritt said to her, "You're going" and moved forward to arrest her.  Id.  To avoid him, Plaintiff again stepped back onto the safe side of the police line just as Seward, who had left the area briefly, returned upon noticing that the crowd was giving Demeritt a hard time.  See Seward BWC at 6:37–:41.  He asked Demeritt whether Paylor was "going" — that is, whether she should be arrested.  Id. at 6:41–:43.  The response: "Yeah, she's going."  Demeritt BWC at 6:41–:42; Pl. SDMF, ¶ 12.

What came next transpired quickly and was not clearly captured on BWC.  Seward moved towards Paylor to arrest her; seeing him coming, she turned and ran.  See Demeritt BWC at 6:41–:43; Paylor Decl., ¶¶ 12–13 (attesting that she ran out of fear).  Seward followed and

quickly apprehended her.  See Demeritt BWC at 6:41–:47; Seward BWC at 6:43–:48.  All agree

that he first grabbed her to halt her escape.  See Seward Decl., ¶ 18; Demeritt Decl., ¶ 16; Paylor

Decl., ¶ 14.  Seward avers that Paylor hit him in the face in response — which she unequivocally

denies — and that he then "struck Plaintiff in the face to stop her from striking [him] again."

Seward Decl., ¶¶ 18–19; Paylor Decl., ¶ 15.  The BWC footage shows a flailing of limbs, but

unfortunately does not resolve the dispute over whether Paylor swung first (or at all, for that

matter).  See Seward BWC at 6:44–:46.  It is undisputed, however, that the two "struggled" after

he grabbed her.  Id. at 6:44–:50; Demeritt BWC at 6:45–:49; Pl. SDMF, ¶ 16.  In the midst of

that struggle, Demeritt tackled Plaintiff to the ground, a maneuver barely captured on the

footage, and shakily at that.  See Seward BWC at 6:48–:50; Pl. SDMF, ¶ 16.

    Once on the ground, Plaintiff yelled for Demeritt to get off of her and continued "trying

to get up" as Demeritt "kept on pushing [her] down."  ECF No. 20-3 (Dep. of Shadonie Paylor)

at 27:14–15; Pl. SMDF, ¶ 17.  The why behind Plaintiff's movements while on the ground?  In

her declaration, she explained that she "was moving around so [she] would not feel the pain" she

was in after the takedown.  See Paylor Decl., ¶ 17.  Testifying at her deposition, however, Paylor

told a different story: "I was moving so they wouldn't arrest me because I didn't do anything

wrong."  Paylor Dep. at 41:11–13.

    While Demeritt was applying force to prevent Plaintiff from "get[ting] up off the

ground," she also felt another officer's boot on her face pushing her down, which is not apparent

on video.  Id. at 25:18–19, 26:21–22.  When asked at her deposition why she believed an officer

had stepped on her, she responded:  "Because they wanted me . . . to get in handcuffs" and to

"stop resisting when I kept putting force to lean up."  Id. at 62:11–16.  The BWC footage of

Plaintiff on the ground is intermittent but generally confirms that she was moving so as to get out

from under Demeritt.  See Seward BWC at 6:53–7:12.  Paylor's struggle on the ground lasted approximately 25 seconds, after which the BWC shows her relaxing enough for the officers to restrain her with handcuffs.  Id. at 7:11–:15; Smith BWC at 1:30–:40; Willis BWC at 4:22–:37. From there, the officers immediately helped her to her feet and led her to the area where her fellow arrestees were awaiting transport.  See Willis BWC at 4:40–5:12; Pl. SMDF, ¶ 19.  She was subsequently processed and charged with resisting arrest, assault on a police officer, and crossing a police line.  See Pl. SDMF, ¶ 21.  These charges were ultimately dropped for reasons unknown to the Court.  See Paylor Decl., ¶ 20; ECF No. 21 (Defs. Reply) at 4 n.2.

Throughout the encounter, Plaintiff accumulated several injuries.  Most significantly, she suffered a black eye, which has caused her ongoing pain.  See Paylor Dep. at 46:3–11, 59:16–60:9; ECF No. 20-5 (Black Eye Picture).  She also sustained a "swollen knee, swollen elbow, and [her] nose was bruised and bleeding."  Paylor Decl., ¶ 16.  At a hospital visit that same day, doctors prescribed Tylenol and recommended rest, ice, and a follow-up visit with another doctor within two days.  See ECF No. 20-6 (Hospital Record) at 6–7.  Although the exact provenance of each of her wounds is largely a mystery, Paylor attributes her black eye to the boot of the officer who used his foot to keep her down on the ground.  See Paylor Dep. at 27:20–28:2.

Seeking recompense for these injuries, Plaintiff filed suit.  She originally filed in the Superior Court of the District of Columbia for claims ranging from excessive force under the Fourth and Fourteenth Amendments to common-law battery and negligence.  See ECF No. 1-2 (Compl.), ¶¶ 17–47.  Defendants removed to this Court, citing federal-question jurisdiction under 28 U.S.C. § 1331.  See ECF No. 1 (Notice of Removal).  Once in federal court, they filed a Partial Motion to Dismiss.  See ECF No. 5 (MTD).  In response, Paylor quickly conceded that all of her claims against the District of Columbia, all her common-law counts, and her Fourteenth

Amendment cause of action were insufficient.  <u>See</u> ECF No. 7 (Resp. to MTD).  The Court accordingly dismissed those claims, leaving only Plaintiff's Fourth Amendment excessive-force count against the three officers.  <u>See</u> Minute Order of Jan. 13, 2023.  Defendant officers have now moved for summary judgment on this last claim.  <u>See</u> ECF No. 17 (MSJ).

## II.    Legal Standard

Courts must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>see also</u> <u>Liberty Lobby</u>, 477 U.S. at 247–48; <u>Holcomb v. Powell</u>, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of litigation.  <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 248; <u>Holcomb</u>, 433 F.3d at 895.  A dispute is "genuine" if the evidence presented would permit a reasonable jury to return a verdict for the nonmoving party.  <u>See</u> <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007); <u>Liberty Lobby</u>, 477 U.S. at 248; <u>Holcomb</u>, 433 F.3d at 895; <u>see also</u> <u>Laningham v. U.S. Navy</u>, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

In viewing this record, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  <u>Liberty Lobby</u>, 477 U.S. at 255; <u>see also</u> <u>Mastro v. PEPCO</u>, 447 F.3d 843, 850 (D.C. Cir. 2006); <u>Aka v. Wash. Hosp. Ctr.</u>, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (<em>en banc</em>).  The Court, in turn, must "eschew making credibility determinations" and avoid "weighing the evidence."  <u>Czekalski v. Peters</u>, 475 F.3d 360, 363 (D.C. Cir. 2007).  The non-moving party's opposition, however, must consist of more than mere

unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The non-movant must put forth evidence that would permit a reasonable jury to find in his favor.  Laningham, 813 F.2d at 1242.

## III.   Analysis

In seeking summary judgment, Defendants argue that they should be shielded from the remaining count via qualified immunity.  As it turns out, Plaintiff is in agreement as it relates to Officer Jarvie, who did not participate in the uses of force at issue here.  See Pl. Opp. at 1. Judgment will thus be entered for him.  As for Officers Seward and Demeritt, the Court addresses in chronological sequence their three distinct uses of force — namely, Seward's hand strike, Demeritt's takedown, and their combined efforts to subdue Paylor on the ground — and examines whether the force was excessive and, if so, whether immunity nonetheless protects Defendants.

### A.   Legal Framework

Paylor asserts violations of her constitutional rights under 42 U.S.C § 1983.  The statute provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Law-enforcement officers run afoul of the Fourth Amendment's excessive-force prohibition when they use more force than is objectively reasonable to arrest a suspect.

Tennessee v. Garner, 471 U.S. 1, 7–8 (1985); Robinson v. District of Columbia, 130 F. Supp. 3d

180, 193 (D.D.C. 2015) ("[Plaintiff] must prove that the force used to carry out that seizure was

objectively unreasonable.") (emphasis omitted).  In assessing reasonableness, courts "must

balance the nature and quality of the intrusion on the individual's Fourth Amendment interests

against the importance of the governmental interests alleged to justify the intrusion."  United

States v. Place, 462 U.S. 696, 703 (1983).  In Graham v. Connor, 490 U.S. 386 (1989), the

Supreme Court laid out four considerations to guide this inquiry: (1) "the severity of the crime at

issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others,"

and" (3) "whether he is actively resisting arrest or" (4) "attempting to evade arrest by flight."  Id.

at 396.  It is important to note, however, that "[n]ot every push or shove, even if it may later

seem unnecessary in the peace of a judge's chambers, violates a[n] [individual's] constitutional

rights."  Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973) (Friendly, J.).

        In asking for summary judgment, Defendants rely on the doctrine of qualified immunity

— "an entitlement not to stand trial under certain circumstances."  Mitchell v. Forsyth, 472 U.S.

511, 525 (1985).  For any alleged constitutional violation, the immunity analysis proceeds in two

parts.  First, "[t]aken in the light most favorable to the party asserting the injury, do the facts

alleged show the officer's conduct violated a constitutional right?"  Saucier v. Katz, 533 U.S.

194, 201 (2001).  If so, the court then asks "whether the right [was] clearly established" — i.e.,

"whether it would be clear to a reasonable officer that his conduct was unlawful in the situation

he confronted."  Id. at 201–02; Anderson v. Creighton, 483 U.S. 635, 640 (1987) ("The contours

of the right must be sufficiently clear that a reasonable official would understand that what he is

doing violates that right.").  That is, "in the light of pre-existing law the unlawfulness must be

apparent."  Anderson, 483 U.S. at 640.  In appealing to pre-existing law, the party asserting

injury need not identify cases with "materially similar" facts where violations have occurred. Johnson v. District of Columbia, 528 F.3d 969, 976 (D.C. Cir. 2008) (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)).  Rather, he must show that the state of the law when the incident occurred gave the officer fair warning of his conduct's unconstitutionality.  Id.

Although the Court may tackle the two immunity inquiries in either order, Pearson v. Callahan, 555 U.S. 223, 236 (2009), no matter the sequence, "a defendant's motion for summary judgment is to be denied only when, viewing the facts in the record and all reasonable inferences derived therefrom in the light most favorable to the plaintiff, a reasonable jury could conclude that the [constitutional violation] is so apparent that no reasonable officer could have believed in the lawfulness of his actions."  Wardlaw v. Pickett, 1 F.3d 1297, 1303 (D.C. Cir. 1993).  The Court here opts to resolve the first two uses of force on the test's second prong, but concludes that the last falters even on the less demanding first prong.

As a preliminary matter, the Court declines Plaintiff's invitation to exclude the BWC in its entirety as lacking foundation because it not only "fails to support the police position," but also "undermines their . . . account."  Pl. Opp. at 9–10.  While it is true that the footage is not determinative on each and every factual dispute, that is no reason to disregard those portions of the interaction it depicts clearly.  See Cooper v. Dist. of Columbia, 548 F. Supp. 3d 170, 179–80 (D.D.C. 2021) (considering BWC footage where available despite fact that officer found "little corroboration by way of BWC footage" for some of his contentions).  Even if Paylor is correct that the officers' accounts directly contradict the BWC footage at points — which is doubtful — that would tend to cast doubt on their attestations rather than on the footage, which she has adduced no reason to think is inauthentic or otherwise inaccurate.  In the following analysis, therefore, the Court relies on the video as warranted.

B.  Hand Strike

First up is Seward's blow to Paylor's face.  At the outset, a factfinder could reasonably conclude that Paylor did not strike Seward first, as the BWC footage does not clearly show as much and Plaintiff denies doing so.  See Paylor Decl., ¶ 15.  As such, the question is whether Seward's hand strike was reasonable in light of Paylor's prior physical altercations with officers, disobedience of orders, flight, and resistance to arrest.

1.  *Fourth Amendment*

Considered under the Graham factors, the reasonableness of Seward's hand strike gives the Court some pause because Paylor's crimes were hardly major and she did not clearly pose a serious threat.  The offense that first occasioned her arrest — crossing a makeshift police line — is of the exceedingly minor variety.  The police report indicates that MPD views such a crossing as a violation of D.C. Mun. Regs. tit. 24, § 2100.3, an offense carrying a fine of no more than $300 and no jail time.  See D.C. Mun. Regs. tit. 24, § 100.6; MPD File at 46.  Indeed, many of those in the crowd that day committed the same offense and were not arrested for it.  To be sure, Paylor was also ultimately charged with assaulting a police officer and resisting arrest.  See MPD File at 45–46.  Both violations, in any event, are misdemeanors punishable by a maximum of no more than six months' imprisonment.  See D.C. Code §§ 22-405(b), 22-405.1(b).

Any threat Plaintiff posed, moreover, was trifling.  There was absolutely no reason for the officers to believe that Paylor — who was unarmed and had not attempted to harm any bystanders — posed a threat to others in the area.  See MPD File at 45.  At most, Seward could have had mild concerns stemming from her hostile and somewhat physical interactions with himself and Jarvie.  But taking the facts in the light most favorable to Plaintiff, that contact had been limited and not particularly forceful.

On the other side of the ledger, there is no doubt that Paylor fled, a fact she readily acknowledges.  See Paylor Decl., ¶ 13.  Although she explains that fear was the reason for her flight, id., that subjective motivation has no bearing on what the uniformed officers reasonably viewed as fully fledged evasion of arrest given that they had announced their plan to arrest her. See Lane v. Dist. of Columbia, 211 F. Supp. 3d 150, 163 (D.D.C. 2016) ("The inquiry focuses on what a reasonable officer would understand about the situation at hand . . . ."); Carpenter v. Gage, 686 F.3d 644, 650 (8th Cir. 2012) (even assuming plaintiff's "motive was innocent," officers could reasonably have interpreted his failure to place hands behind his back and attempt to stand up during arrest as resistance).

So, too, despite her contesting this point in her Opposition, see Pl. Opp. at 7, there is hardly a dispute that Plaintiff was actively resisting arrest at the time that Seward struck her.  See Pl. SDMF, ¶ 16 (agreeing that she was engaged in a "struggle[]" with him).  The BWC video, while unhelpful on the precise manner and nature of their struggle, confirms that Paylor was hardly still after Seward grabbed her.  See Seward BWC at 6:44–:50; Demeritt BWC at 6:45– :49.  And, as discussed infra, the fact that she admits to resisting arrest later in the interaction places the conclusion that she was resisting at this point on solid footing.

Still, Paylor's resistance and flight do not settle the matter conclusively because they are somewhat ill-fitting justifications for punching her in the face.  That kind of force may certainly assist in subduing a suspect, but it does not seem the first or best way to get somebody into restraints.  Indeed, Seward's explanation that he hit Plaintiff "to stop her from striking me again" does not rest on a need to subdue, but rather to defend.  See Seward Decl., ¶ 19.  That rationale cannot carry the day here since a jury could find that no such precipitating event occurred. Although Paylor's noncompliance and evasion justified some use of force, then, it is not beyond

cavil that they justified <u>this</u> use of force.  The Court, consequently, hesitates to rule out that Seward's hand strike was excessive.

### 2. *Qualified Immunity*

This Circuit's caselaw, however, makes clear that qualified immunity nonetheless shields Seward because "the excessiveness of the force [was not] so apparent that no reasonable officer could have believed in the lawfulness of his actions."  <u>Wardlaw</u>, 1 F.3d at 1303.  <u>Wardlaw</u> is instructive.  There, two officers were removing an uncooperative individual from a courthouse via a stairwell when Wardlaw rushed down the stairs towards them, yelling, "Don't hurt him please."  <u>Id.</u> at 1300.  In response, one of the officers punched Wardlaw once in the jaw and several more times in the chest.  <u>Id.</u>  The D.C. Circuit held that the strikes were not so clearly excessive that qualified immunity was inappropriate.  <u>Id.</u> at 1303–04.  In so ruling, it explained that the officer "reasonably could have anticipated a confrontation" with Wardlaw because he was on high alert due to a demonstration that was to occur at the courthouse that day, and because Wardlaw had yelled as he approached.  <u>Id.</u>  The court also found it noteworthy that the strikes were relatively few in number and that Wardlaw's injuries were not severe, which suggested a somewhat minor degree of force behind the blows.  <u>Id.</u> at 1304 & n.7.

The circumstances here are even more favorable to the officers than those in <u>Wardlaw</u>. Paylor did not just place Seward in reasonable apprehension of a confrontation; she was actively struggling with him.  Even if she had not yet hit him, <u>Wardlaw</u> suggests that her actions were enough to put him on guard about that eventuality.  Seward also struck her just once, and nothing in the record indicates that any of Paylor's injuries stemmed from the hit.  In fact, she blames her black eye — the worst damage — on events that occurred later.  <u>See</u> Paylor Dep. at 27:20–28:2.

Also of note is <u>Scott v. District of Columbia</u>, 101 F.3d 748 (D.C. Cir. 1996).  In that case, Scott — who had been arrested for drunk driving and appeared erratic and belligerent at the scene of arrest — became disoriented during his ride to the police station and attempted to exit the police cruiser at an intersection.  <u>Id.</u> at 751–52.  The officer sitting next to him grabbed him to prevent his grand escape.  <u>Id.</u> at 759.  Soon, other officers arrived, and Scott offered to get back into the cruiser.  <u>Id.</u>  Fearing that he might cause the car damage if allowed back in unrestrained and viewing him as a still-active flight risk, the officers did not take him up on the offer; rather, one officer struck him a single time, then two officers teamed up to slam Scott to the ground so they could handcuff him and take him to a more secure police vehicle.  <u>Id.</u>  The court granted qualified immunity because "[a]ll of the officers' actions," including the single hand strike, "were reasonably calculated toward the goal of securing Scott and placing him in handcuffs, while minimizing his opportunity to escape."  <u>Id.</u> at 760.

Here, like in <u>Scott</u>, the officers reasonably believed that some force was justified to prevent Paylor's escape, which was not just reasonably anticipated, but in progress.  Also akin to <u>Scott</u>, Seward used a solitary hand strike that did not apparently cause much injury to secure a suspect who remained an ongoing flight risk.  To be sure, the <u>Scott</u> court rested its conclusion in part on the need to control Scott's drunken and "erratic behavior," whereas Paylor was in control of her faculties.  <u>Id.</u> at 759.  Yet Paylor was erratic in her own way: she had disregarded several police orders and resisted her arrest to at least a moderate degree.  Seward thus reasonably could have feared escalation absent some use of force to subdue her.

In short, it follows from <u>Wardlaw</u>, <u>Scott</u>, and myriad like cases that Seward's use of a single, not particularly forceful hand strike against an evasive and resistant suspect is shielded by qualified immunity.  <u>See, e.g.</u>, <u>Husbands ex rel. Forde v. City of New York</u>, 335 F. App'x 124,

129 (2d Cir. 2009) ("One punch causing no injury to a suspect who is resisting being put in handcuffs does not rise to the level of excessive force."); Johnson v. Dist. of Columbia, 490 F. Supp. 3d 144, 165 (D.D.C. 2020) ("[T]he use of hand strikes may be appropriate — and not in violation of clearly established law — where the arrestee is not subdued, but rather resisting."); Harris v. Allison, 2016 WL 3166296, at *3 (D.D.C. June 6, 2016) (no excessive force where officer punched prisoner twice, not causing serious injury, in the course of subduing him while he "resist[ed] efforts to restrain him").

Aside from bald denials that she never resisted arrest, Plaintiff offers little by way of a response to this conclusion. Her case citations, for instance, do not get her far. In two of the cases, the court granted qualified immunity to the officers, and Plaintiff does not explain how such a ruling could support her cause. See Oberwetter v. Hilliard, 680 F. Supp. 2d 152, 168 (D.D.C. 2010), aff'd, 639 F.3d 545, 555–56 (D.C. Cir. 2011); Hedgpeth v. Rahim, 893 F.3d 802, 809 (D.C. Cir. 2018). Another is completely inapposite in that it dealt with an assault by off-duty officers not carrying out an arrest, nor even acting within the scope of their employment, but brutally beating a man who expressed displeasure about their drunken behavior. Dist. of Columbia v. Bamidele, 103 A.3d 516, 519–20 (D.C. 2014). Qualified immunity was not even colorably at issue.

The only two cases cited by Plaintiff in which qualified immunity was denied are factually distinct. One did not involve flight or resisting arrest. See Katz v. Dist. of Columbia, 285 A.3d 1289, 1313 (D.C. 2022) (reversing grant of qualified immunity because jury could have found that "officers handcuffed [plaintiff too tightly] without probable cause, even though he did not resist officers or attempt to escape"). Plaintiff gets closer with her citation to Hudson v. District of Columbia, 517 F. Supp. 2d 40 (D.D.C. 2007), aff'd in part, vacated in part, 558

F.3d 526 (D.C. Cir. 2009), in which police pursued a suspect into his home to arrest him (apparently for helping his friend evade arrest and lobbing a piece of wood at the officers) and, once inside, struck him multiple times with a metal baton.  Id. at 42–43, 49.  Hudson's reasoning is fairly cursory, but from what can be discerned, it, too, presented a very different case from ours.  The arrestee there had seemingly fled police, but nothing suggests that he otherwise resisted arrest.  Id. 50–51.  While his offenses, like Paylor's, were relatively minor, he also prevailed on a false-arrest claim, making the decision to pursue him doubly suspect.  Id. at 43.  In addition, his injuries — which included a broken finger — were more severe, as one would expect based on the tool used to inflict them.  Id. at 50.  A single punch — which Plaintiff never attests caused her injury — in the course of subduing a resisting suspect who had committed a minor offense does not compare to multiple, bone-breaking baton strikes aimed purely at preventing escape when there was no probable cause at all.  Plaintiff has therefore failed to identify any precedent that would have put Defendants on notice that their actions were unreasonable, and the Court is not aware of any such authority to that effect.

Paylor also repeatedly contends in her Opposition that, like the plaintiff in Hudson, she had done nothing justifying her arrest in the first place.  See Pl. Opp. at 2, 6–7.  But she has pled no false-arrest claim, and Defendants are correct that she cannot amend her Complaint through summary-judgment briefing.  See Defs. Reply at 3; Furey v. Mnuchin, 334 F. Supp. 3d 148, 164 (D.D.C. 2018) (collecting cases).  Even if she could, the camera footage conflicts with her account decisively.  Whereas she portrays herself as a completely obedient bystander merely filming others' arrests, see Pl. Opp. at 2–3, the video shows her shoving Seward to protect Burley, ignoring police commands, and repeatedly crossing a police line.  See Jarvie BWC at 3:06–:12, 3:31–:33; Demeritt BWC at 6:05–:12, 6:32–:38.  The fact that her charges were

dropped, moreover, is of no moment in light of the record evidence confirming that she in fact committed the offenses.  <u>Contra</u> Pl. Opp. at 6.

To be sure, the Court is not entirely certain that the police-line offense would hold up to scrutiny given the cited regulation's seemingly narrow scope and the First Amendment concerns attendant to limiting bystanders' ability to film police officers through establishment of a police line.  <u>See</u> <u>Bolz v. Dist. of Columbia</u>, 149 A.3d 1130, 1142 (D.C. 2016) (explaining that relevant regulation is "designed to clear the thoroughfares [and] does not give the police carte blanche to address any perceived public safety concern unrelated to that fundamental purpose"); <u>Bloch v. Dist. of Columbia</u>, 863 A.2d 845 (D.C. 2004) (reversing police-line-crossing conviction on First Amendment challenge); <u>Price v. Garland</u>, 45 F.4th 1059, 1070 (D.C. Cir. 2022) ("Filming a public official performing public duties on public property implicates unique first amendment interests.").  Still, Paylor does not raise these points, nor would they negate the fact that she began resisting arrest before any of the contested uses of force, giving rise to another arrestable offense even if the initial one was faulty.  <u>See</u> D.C. Code § 22-405(d) ("It is neither justifiable nor excusable cause for a person to use force to resist an arrest when such an arrest is made by an individual he or she has reason to believe is a law enforcement officer, <u>whether or not such arrest is lawful</u>.") (emphasis added).

*     *     *

The Court is not endorsing the manner in which the officers handled this confrontation as it escalated into the arrests of multiple individuals.  But the only question it must answer is whether qualified immunity is warranted.  As the record leaves no room for doubt that Paylor fled and resisted arrest — facts that the caselaw treats as all but decisive in allowing the use of some minimal force — her excessive-force claim based on Seward's punch cannot proceed.

C.  <u>Takedown</u>

The analysis is much the same for Demeritt's takedown of Paylor, which occurred in nearly the same circumstances as the prior hand strike.  The Court examines a few possibly relevant differences between the hand strike and the takedown, concluding that none tips the scales in Paylor's favor on this portion of her claim.

One difference lies in Demeritt's reason to believe that Plaintiff posed a threat.  Unlike Seward, he was not privy to any earlier scuffle between Paylor and other officers during the Burley arrest, so he had less reason to think that she was a threat.  <u>See</u> <u>Orn v. City of Tacoma</u>, 949 F.3d 1167, 1177 (9th Cir. 2020) (events officer did not witness are "irrelevant" to excessive force analysis).  His takedown was thus performed solely on the basis of her flight, her ongoing struggle with Seward, and her earlier disobedience of commands to stay behind the police line.

This distinction does not turn the tide for Plaintiff because flight and resistance to arrest are generally considered a sufficient basis for a takedown, even in cases involving minor crimes, investigative stops, and people who did not pose a serious threat.  <u>Scott</u>, 101 F.3d at 759–60 (officers were "entitled to use reasonable force to prevent [DUI arrestee] from escaping," and takedown maneuver was not "more force than reasonably appeared necessary to achieve that goal"); <u>United States v. Dykes</u>, 406 F.3d 717, 720 (D.C. Cir. 2005) (tackling drug-offense suspect "in full flight from officers who were justified in stopping him" did not offend Fourth Amendment); <u>Hedgpeth</u>, 893 F.3d at 809 (takedown not clearly excessive where plaintiff under arrest for simple assault refused to place hands behind his back, had been shouting at officers, and had been described by friend as "hard to handle"); <u>Cutchin v. Dist. of Columbia</u>, 369 F. Supp. 3d 108, 114, 125–26 (same where plaintiff arrested for not paying bus fare ran from police after already handcuffed); <u>Elshazli v. Dist. of Columbia</u>, 415 F. Supp. 3d 20, 23, 25–26 (D.D.C.

2019) (same where plaintiff repeatedly pulled his arms away from officers attempting to handcuff him, "[e]ven considering [his] age, lack of apparent weapons, and the minor charges" at issue); United States v. Leake, 2020 WL 3489523, at *3–4, *12 (D.D.C. June 26, 2020) (same where plaintiff suspected of drug possession tried to run away from officer and resisted subsequent attempts at restraint).

Next is the sequence of the uses of force.  Demeritt's takedown occurred after Seward had already grabbed and struck Paylor.  This, however, does not appear to change the calculus much.  There is no evidence, for instance, that Paylor's struggle with Seward ended or even diminished after he hit her.  Even if that had been the case, the combination of a single punch and a takedown has been sanctioned in similar scenarios.  See Scott, 101 F.3d at 759–60 (takedown still justified after suspect knocked off balance and doubled over from preceding hand strike).

Last is the use of force itself.  A takedown is no doubt different in kind from a hand strike.  This distinction does not cut in just one direction, though.  On the one hand, a takedown can be a more forceful action.  But here, there is essentially no evidence about how forceful it was or what injuries it caused — only Paylor's characterization of it as a "tackle[]."  Paylor Decl., ¶ 16.  At most, Paylor sustained a few scrapes and bruises from the takedown, suggesting it was not significantly more forceful than Seward's punch.  Id. (listing swollen knee and elbow and bruised nose as injuries).  On the other hand, a takedown is clearly aimed at subduing a resisting suspect, while a hand strike is somewhat less targeted at achieving that goal.  In any event, as already discussed, the caselaw is clear that an officer's takedown in scenarios involving resistance to arrest and flight are not so obviously excessive that no reasonable officer could believe them lawful.  See Hedgpeth, 893 F.3d at 809–11; Scott, 101 F.3d at 759–60.

The takedown, then, like the earlier punch thrown in nearly identical circumstances, is an action for which Demeritt is qualifiedly immune from suit.

D.  Acts on Ground

Paylor's accusation of excessive force once she was on the ground is the weakest of the bunch.  As a refresher, the BWC footage shows Demeritt using his hands and body weight to push Plaintiff to the ground and keep her there so he can handcuff her while she seemingly attempts to twist out of his grasp.  See Smith BWC at 1:30–40.  Although it does not appear in the footage, Plaintiff also felt a boot on her face pushing her down, which she believes caused her black eye.  See Paylor Dep. at 27:17–19.  Once she relaxed enough to allow the officers to fasten the handcuffs, the uses of force ceased, and she was immediately helped to her feet.  See Willis BWC at 4:40–5:12.

It is Plaintiff's own testimony that dooms this claim.  While on the ground she was — in her own words — "trying to get up," "moving so they wouldn't arrest me," "putting force to lean up," and, most bluntly of all, "resisting."  Paylor Dep. at 27:14, 41:11–12, 62:15–16.  Not only does she acknowledge that she was actively seeking to avoid arrest, but she also testified that the force was reasonably calculated to subdue her.  As she put it, Demeritt was "putting force on [her] not to get up off the ground," and the overall effect of his actions was to "stop[] [her] from moving."  Id. at 25:18–19, 29:2.  As for Seward, she testified that stepping on her face was the "only way" to "get [her] down."  Id. at 62:17.  In light of these statements, Paylor's representation in her Opposition that this is a case about excessive use of force "against a subdued and non-resisting individual" can be disregarded.  See Pl. Opp. at 8.

If this were not enough, it is well established that short-lived, minimal uses of force deployed to facilitate handcuffing a resisting arrestee — that is, the kind of force at issue here —

are reasonable under the Fourth Amendment.  The caselaw on this point is ubiquitous and

unanimous.  See, e.g., Scott, 101 F.3d at 759–60 (pinning arrestee to ground by placing knees on

his neck, back, and legs so he could be handcuffed not clearly excessive); Oberwetter, 680 F.

Supp. 2d  at 168 (shoving plaintiff against pillar and twisting her arm in course of arrest for

minor offense not excessive force where officer "reasonably believed [she] might try to resist

arrest or escape"); Arthur v. Dist. of Columbia Housing Auth., 2020 WL 1821111, at *13

(D.D.C. Apr. 11, 2020) (granting qualified immunity where plaintiff under arrest for nonviolent

offense "push[ed] back on the officers as they attempted to hold him down on the bed to

handcuff him"), abrogated on other grounds by Abreu v. Howard Univ., 2024 WL 737515 (D.C.

Cir. Feb. 23, 2024); Armbruster v. Frost, 962 F. Supp. 2d 105, 113–14 (D.D.C. 2013) (after

arrestee bucked up against officer to prevent him from handcuffing her against hood of police

car, officer reasonably pinned arrestee to ground to place handcuffs on her); Ulysse v. Stokes,

2021 WL 4476768, at *7 (D.D.C. Sept. 30, 2021) (not clearly excessive for officer to, among

other actions,"use[] his knees to aid in subduing a resisting arrestee" under suspicion of not

paying for public transport); Elshazli, 415 F. Supp. 3d at 23, 25–26 (holding that pulling

arrestee's hands from underneath his body so as to handcuff him was among several reasonable

and proportionate uses of force).

No doubt, several of the above cases place some weight on the fact that the plaintiff

sustained no serious injury in the course of the arrest.  See Scott, 101 F.3d at 757, 759–60;

Oberwetter, 639 F.3d at 555–56.  That Paylor's most serious injury came into being while she

was on the ground is thus relevant.  Still, it is ultimately insufficient to make the officers' actions

clearly excessive, particularly in light of Plaintiff's testimony that the force was the "only way"

to subdue her.  See Paylor Dep. at 62:17; Goolsby v. Dist. of Columbia, 317 F. Supp. 3d 582,

594–95 (D.D.C. 2018) (noting that "injury to the plaintiff is not dispositive but rather only a factor to consider" and allowing "greater degree of permissible force" in cases where suspect is actually resisting or fleeing, rather than just posing risk of same, as in <u>Oberwetter</u> and <u>Scott</u>).

Plaintiff seems to rejoin that since she was only moving around on the ground to "not feel the pain," the officers' continued use of force was improper.  <u>See</u> Paylor Decl., ¶ 17.  Without even considering that elsewhere Plaintiff openly admitted that her motivations were to avoid arrest, <u>see</u> Paylor Dep. at 41:11–12, this argument still comes to naught.  Just as the reason for her flight would not have been apparent to the officers, Paylor gives no explanation for how or why Defendants should have known that her actions were not truly resistance, rather than an involuntary pain response.  Since it is this objective inquiry that matters for purposes of the Fourth Amendment, the subjective reason for her resistance does not, on its own, counsel a different conclusion.  <u>See</u> <u>Carpenter</u>, 686 F.3d at 649–50.  Plaintiff's last attempt, like her others, thus falls short.

## IV.    Conclusion

The Court, accordingly, will grant Defendants' Motion for Summary Judgment in its entirety.  A separate Order so stating will issue this day.

<u>/s/ James E. Boasberg</u>
JAMES E. BOASBERG
Chief Judge

Date:  <u>March 11, 2024</u>